# IN THE SUPREME COURT OF CALIFORNIA

SANFORD J. WISHNEV,

Plaintiff and Respondent,

v.

THE NORTHWESTERN MUTUAL LIFE INSURANCE
COMPANY,

Defendant and Appellant.

S246541

Ninth Circuit
16-16037

Northern District of California
3:15-cv-3797-EMC

November 14, 2019

Justice Corrigan authored the opinion of the Court, in which
Chief Justice Cantil-Sakauye and Justices Chin, Liu, Cuéllar,
Kruger, and Groban concurred.

WISHNEV v. THE NORTHWESTERN MUTUAL LIFE
INSURANCE COMPANY

S246541


Opinion of the Court by Corrigan, J.


The body of California law prohibiting usury derives from a variety of sources, including a constitutional amendment. (Cal Const.,[1] art. XV, § 1.) The amendment sets the maximum interest rates lenders may charge but exempts specified classes of lenders from those rate restrictions. The amendment also authorizes the Legislature to regulate "in any manner" the compensation these exempt lenders may receive. (*Ibid.*)

We accepted a request from the United States Court of Appeals for the Ninth Circuit to determine whether exempt lenders must comply with a voter-approved limitation that was in place before the amendment was enacted in 1934.[2] The precise question we agreed to consider is set forth in the footnote

---

[1] Further references to articles are to the California Constitution.

[2] See California Rules of Court, rule 8.548(a) ("On request of the United States Supreme Court, a United States Court of Appeals, or the court of last resort of any state, territory, or commonwealth, the Supreme Court may decide a question of California law if: [¶] (1) The decision could determine the outcome of a matter pending in the requesting court; and [¶] (2) There is no controlling precedent").

below.[3]  Simply stated, the question is:  Are exempt lenders like The Northwestern Mutual Life Insurance Company (Northwestern Mutual) required to obtain a borrower's signed agreement in order to charge compound interest on a loan?  We conclude the lenders are not so obligated.

## I.  BACKGROUND

Northwestern Mutual offers a life insurance product referred to as "permanent" life insurance.[4]  It pays a benefit upon death and accumulates a cash value during the insured's lifetime.  The policy also pays an annual dividend to the policyholder, who may take out loans secured by the cash value of the policy.[5]

Between 1967 and 1976, Northwestern Mutual issued four permanent life policies to Sanford J. Wishnev, who completed and signed an application for each.  None of the applications disclosed that Northwestern Mutual would charge compound interest.  After Wishnev submitted each signed application, Northwestern Mutual sent him the requested policy.  Each states that "[t]his policy and the application, a copy of which is

---

[3] The Ninth Circuit posed the question as follows:  "Are the lenders identified in Article XV of the California Constitution, *see* Cal. Const. art. XV, § 1, as being exempt from the restrictions otherwise imposed by that article, nevertheless subject to the requirement in section 1916–2 of the California Civil Code that a lender may not compound interest 'unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith'?"

[4] Whole and universal life insurance are examples of permanent life insurance.

[5] Policyholders can also have unpaid premiums automatically treated as loans.

attached when issued, constitute the entire contract." The
policies do explain that loan interest is compounded annually,
but Wishnev was not required to sign and return any copy.

At some point after 1980, Wishnev took out four loans
secured by his four policies. Northwestern Mutual assessed
compound interest on the loan balances.

Wishnev filed a putative class action suit in state court
alleging Northwestern Mutual's assessment of compound
interest was barred because he never signed an agreement to
that effect. He claims damages because the loan balances,
increased by compound interest, reduced the amount he
received in annual dividends. Wishnev seeks to certify a class
of all persons who were charged similar compound interest in
the previous four years. On behalf of the class, he requests
actual damages along with treble the amount of *all* interest paid
within one year of the filing of the complaint.

Northwestern Mutual removed the action to federal
district court and moved to dismiss. It argued that, as an
exempt lender, it was not required to obtain a borrower's signed
consent to charge compound interest.[6] The court denied the
dismissal motion, holding that Northwestern Mutual was

---

[6] Northwestern Mutual further argued that, even if it were
subject to the limitation on assessing compound interest, it had
complied because Wishnev signed an agreement containing the
mandated disclosure. It urged that the policy application
Wishnev signed, together with attached policy containing the
disclosure, formed the parties' " 'entire contract' " under
Insurance Code section 10113. Because we conclude that
Northwestern Mutual is not subject to the compound interest
limitation, it is unnecessary to address this question.

required to get signed consent and failed to do so. (*Wishnev v. Northwestern Mut. Life Ins. Co.* (N.D.Cal. 2016) 162 F.Supp.3d 930, 947, 949, 953 (*Wishnev I*).)

The district court in *Wishnev I* stands alone in its determination that exempt lenders must obtain a borrower's signed consent to impose compound interest. (*Wishnev v. Northwestern Mut. Life Ins. Co.* (9th Cir. 2018) 880 F.3d 493, 501–502 (*Wishnev II*).) Three other district courts in the Ninth Circuit have concluded to the contrary. (*Ibid.*; see *Martin v. Metro. Life Ins. Co.* (N.D.Cal. 2016) 179 F.Supp.3d 948, 954–955; *Washburn v. Prudential Ins. Co. of Am.* (N.D.Cal. 2015) 158 F.Supp.3d 888, 896; *Lujan v. New York Life Ins. Co.* (N.D.Cal., Aug. 9, 2016, No. 16-CV-00913-JSW) 2016 WL 4483870, p. *5.)

## II. DISCUSSION

California's usury laws, which regulate the charging of interest, are far from a model of clarity. Their sources include (1) an uncodified, voter-approved initiative (9C West's Ann. Civ. Code (2010 ed.) foll. § 1916.12, pp. 187–238), (2) voter-approved constitutional provisions currently found in article XV, and (3) statutes scattered throughout various codes regulating lenders considered exempt under article XV. (See Rabin & Brownlie, *Usury Law in California: A Guide Through the Maze* (1987) 20 U.C. Davis L.Rev. 397, 398.) Administrative provisions, federal law, and state common law also play a role. (*Id.* at p. 397.) The interplay among these sources continues to generate confusion. We begin with a brief history of California's usury laws to put the relevant authorities into perspective.

A.    *California's Usury Laws*

In the early years of California's statehood, the Legislature declined to set maximum interest rates for loans and instead enacted a law generally allowing parties to agree in writing for " 'any rate of interest whatever on money due . . . .' " (*Carter v. Seaboard Finance Co.* (1949) 33 Cal.2d 564, 575 (*Carter*).)  Over time, the Legislature enacted usury statutes governing maximum interest chargeable by lenders that typically make small loans, such as pawnbrokers and personal property brokers.  (*Id.* at pp. 575–576.)

In 1918, California voters approved an initiative measure that took a uniform approach to usury (hereafter the "initiative" or "1918 initiative").[7]    (§§ 1916–1-1916–5; *Carter, supra,* 33 Cal.2d at p. 576.)  The initiative repealed statutory schemes covering various classes of lenders and replaced them with a maximum allowable interest rate applicable to *all* loans and lenders. (§ 1916–4; *Carter,* at p. 576.)  No loans or lenders were exempted from the sweep of the 1918 initiative.  Because the initiative does not authorize legislative amendment, voters alone have the power to amend or repeal it.[8]  (Art. II, § 10,

---

[7] The 1918 initiative is uncodified.  Further unspecified section references are to West's designation of the initiative as sections 1916–1 to 1916–5 of the Civil Code.  (9C West's Ann. Civ. Code, *supra,* foll. § 1916.12, pp. 187–238.)

[8] The Legislature or voters (through the initiative power) may place measures on the statewide ballot proposing to repeal or amend laws enacted by initiative.  (Art. II, §§ 8, subds. (a)–(c), 10, subd. (c); art. XVIII, § 1; cf. *People v. Kelly* (2010) 47 Cal.4th 1008, 1037–1040.)

subd. (c); *Penziner v. West American Finance Co.* (1937) 10 Cal.2d 160, 171 (*Penziner*).)

In addition to setting the allowable interest rate, the 1918 initiative provides that interest may not be compounded "unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." (§ 1916–2.) We refer to this requirement as the compound interest limitation. Ultimately, the question here turns on whether subsequent changes impliedly repealed the compound interest limitation as to exempt lenders.

Under the 1918 initiative, a lender that charges interest above the rate cap or violates the compound interest limitation is subject to stringent statutory penalties. Such a lender forfeits the right to collect *any* interest. (§ 1916–2.) Further, the principal debt is not due until the full term of the loan has expired. (*Ibid.*) The effect of these provisions is to confer upon the borrower the free use of the lender's money for the duration of the loan period. In addition, if a borrower pays a lender more than is authorized by the 1918 initiative, the borrower is entitled to recover treble the amount paid if the action is brought within one year of payment. (§ 1916–3, subd. (a).)

The 1918 initiative contains five sections, the first three of which limit interest rates and set penalties for violating its restrictions.[9] The first section sets a presumptive annual interest rate of 7 percent but allows parties to contract in writing for an annual rate of up to 12 percent. (§ 1916–1.) This

---

[9] The fourth section repeals any inconsistent laws and the fifth section refers to the initiative as the " 'usury law.' " (§§ 1916–4, 1916–5.)

rate-setting provision establishes what contracting parties are legally authorized to do in setting interest rates.

The second section sets out what parties cannot do. It prohibits any person or entity from receiving, "directly or indirectly," more than 12 percent annual interest on any "loan or forbearance of money, goods or things in action . . . ." (§ 1916–2.) The sentence containing that prohibition concludes with the compound interest limitation: "and . . . interest shall not be compounded, nor shall the interest thereon be construed to bear interest unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith." (*Ibid.*) Any contract that violates the second section is "null and void" as to any agreement to pay interest, and no legal action may be maintained to recover interest "in any sum" under the contract.[10] (§ 1916–2.)

---

[10] In its entirety, section 1916–2 reads as follows: "No person, company, association or corporation shall directly or indirectly take or receive in money, goods or things in action, or in any other manner whatsoever, any greater sum or any greater value for the loan or forbearance of money, goods or things in action than at the rate of twelve dollars upon one hundred dollars for one year; and in the computation of interest upon any bond, note, or other instrument or agreement, interest shall not be compounded, nor shall the interest thereon be construed to bear interest unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith. Any agreement or contract of any nature in conflict with the provisions of this section shall be null and void as to any agreement or stipulation therein contained to pay interest and no action at law to recover interest in any sum shall be maintained and the debt can not be declared due until the full period of time it was contracted for has elapsed."

The third section establishes civil and criminal penalties. It allows recovery of treble damages and provides, under specified circumstances, that a person who receives interest beyond that legally authorized is guilty of felony loan-sharking. (§ 1916–3.)

The 1918 initiative's "one-size-fits-all" approach proved to be unworkable in the marketplace. It lacked the flexibility needed to tailor regulations for particular types of loans and lenders. (See *Carter*, *supra*, 33 Cal.2d at p. 577.) "Numerous attempts were made to change the rates of interest and to prescribe rates and regulations different from or inconsistent with the provisions of the [1918 initiative]." (*Ibid.*) These attempted modifications were ruled improper to the extent they constituted revisions of the initiative without a vote of the electorate. In addition, the initiative's interest rate cap could be easily avoided. Lenders were able to circumvent interest rate limits by extracting various "charges" from borrowers. (*Ibid.*) Ultimately, the Legislature placed a proposed constitutional amendment on the statewide ballot to address the infirmities of the 1918 initiative. (*Carter*, at p. 577; see Ballot Pamp., Gen. Elec. (Nov. 6, 1934), argument in favor of Assem. Const. Amend. No. 79, p. 18 (Ballot Pamp.).)

In November 1934, voters approved the proposed amendment, which was added to the Constitution as former article XX, section 22 (hereafter "amendment" or "1934 amendment"). (*Carter*, *supra*, 33 Cal.2d at p. 577.) The first paragraph contains a rate-setting provision substantially similar to the 1918 initiative, except that the annual interest rate permitted is reduced to 10 percent. (Compare former art. XX, § 22, 1st par. with § 1916–1.)

The second paragraph of the 1934 amendment prohibits charging annual interest greater than 10 percent. (Former art. XX, § 22, 2d par.) The second paragraph expands upon the 1918 initiative's attempt to prohibit lenders from "directly or indirectly" exceeding the maximum rate. It clarifies that no lender may "by charging any fee, bonus, commission, discount *or other compensation* receive from a borrower more than ten per cent per annum . . . ." (Former art. XX, § 22, 2d par., italics added.) Aside from reducing the maximum allowable interest from 12 to 10 percent, this provision is substantially similar to the first part of section 1916–2. (*Penziner*, *supra*, 10 Cal.2d at p. 172.) However, the 1934 amendment makes no mention of the compound interest limitation. (See *Penziner*, at p. 172.) Indeed, it says nothing about the compounding of interest. (Former art. XX, § 22.) This omission gives rise to the controversy here.[11]

Importantly, the third paragraph of the 1934 amendment for the first time exempts certain lenders from its restrictions. (Former art. XX, § 22, 3d par.) These exempt lenders include credit unions, licensed pawnbrokers, and certain banks, among others. Insurance companies were not exempted when the amendment was originally enacted. (See *ibid.*)

There are two distinct components to the 1934 amendment governing exempt lenders. First, it declares that "none of the above restrictions" shall apply to exempt lenders.

---

[11] Also, unlike the 1918 initiative, the amendment does not address penalties or the consequences of violating its restrictions. (Compare former art. XX, § 22 with §§ 1916–2, 1916–3, subd. (b).)

(Former art. XX, § 22, 3d par.)  Thus, exempt lenders are not
bound by interest *rate* provisions contained in the first two
paragraphs.  (*Carter, supra,* 33 Cal.2d at pp. 579–580.)  Second,
the amendment explicitly authorizes the Legislature to
prescribe maximum interest rates applicable to exempt lenders
and to "*in any manner fix, regulate or limit, the fees, bonus,
commissions, discounts or other compensation which all or any
of the said exempted classes of persons may charge . . . .*" (Former
art. XX, § 22, 3d par., italics added.)   This delegation of
legislative authority confers flexibility the 1918 initiative did
not.  While the 1918 initiative could only be modified by voters,
the 1934 amendment specifically empowered the Legislature to
enact and modify laws regulating exempt lenders.

The final paragraph of the 1934 amendment contains
what this court has described as a "limited repealing clause"
(*Penziner, supra,* 10 Cal.2d at p. 174):  "The provisions of this
section shall supersede all provisions of this Constitution and
laws enacted thereunder in conflict therewith."  (Former art.
XX, § 22.)  We consider the significance of this language below.

The 1934 amendment originally enacted as former article
XX, section 22 subsequently was amended and reenacted in its
current form as section 1 of article XV.[12]  (*Bisno v. Kahn* (2014)
225 Cal.App.4th 1087, 1100.)  Article XV was again amended in

---

[12] Because article XV at present consists of a single section,
further citations to that article will omit the section reference as
superfluous.  Further references to the relevant constitutional
provisions governing usury will be to their current designation,
article XV, unless the context requires citation to those
provisions as originally enacted in former article XX, section 22.

1979 to allow the Legislature to designate additional classes of exempt lenders.[13]  In 1981, the Legislature amended the Insurance Code to designate "incorporated admitted insurers" as exempt under article XV.  (Ins. Code, § 1100.1; Stats. 1981, ch. 979, § 1, p. 3806.)  It is undisputed that Northwestern Mutual is an exempt lender.

B.  *Applicability of Compound Interest Limitation to Exempt Lenders*

Whether exempt lenders are subject to the compound interest limitation is a question of statutory construction:  Did the 1934 amendment, the substance of which now appears in article XV, repeal the compound interest limitation as to exempt lenders?

Standard rules of statutory interpretation guide the analysis.  (*People v. Superior Court* (*Pearson*) (2010) 48 Cal.4th 564, 571.)  "We first consider the initiative's language, giving the words their ordinary meaning and construing this language in the context of the statute and initiative as a whole.  If the language is not ambiguous, we presume the voters intended the meaning apparent from that language, and we may not add to the statute or rewrite it to conform to some assumed intent not apparent from that language.  If the language is ambiguous,

---

[13] The amendment was accomplished by Proposition 2, approved by voters on November 6, 1979.  (Ballot Pamp., Special Elec. (Nov. 6, 1979) analysis of Prop. 2 by Legis. Analyst, p. 10; *id.*, text of Prop. 2, p. 11.)  The same proposition modified the maximum interest rate applied to nonexempt lenders.  The latter modification of article XV, as well as other provisions in article XV that did not appear in former article XX, section 22, are not relevant to the legal question here.

courts may consider ballot summaries and arguments in determining the voters' intent and understanding of a ballot measure." (*Ibid.*)

Northwestern Mutual argues that the 1934 amendment expressly repealed the compound interest limitation. The language of the amendment does not support express repeal. Article XV declares that "none of the above restrictions" apply to exempt lenders. The "above restrictions" are those in the immediately preceding two paragraphs establishing permitted interest rates. (See *Carter*, *supra*, 33 Cal.2d at pp. 579–580.) Those restrictions say nothing about compound interest. The other component of article XV relating to exempt lenders is the grant of legislative authority to set the maximum annual interest rate and to "fix, regulate or limit, the fees, bonuses, commissions, discounts or other compensation" charged by exempt lenders. Again, the constitutional language does not mention compound interest. Accordingly, there is no express repeal.

The question of implied repeal remains. "Notwithstanding the 'presumption against repeals by implication,' repeal may be found where (1) 'the two acts are so inconsistent that there is no possibility of concurrent operation,' or (2) 'the later provision gives undebatable evidence of an intent to supersede the earlier' provision." (*Professional Engineers in California Government v. Kempton* (2007) 40 Cal.4th 1016, 1038.) "Because 'the doctrine of implied repeal provides that the most recently enacted statute expresses the will of the Legislature' [citation], application of the doctrine is appropriate in those limited situations where it is necessary to effectuate the intent of drafters of the newly enacted statute. ' "In order for

the second law to repeal or supersede the first, the former must constitute a revision of the entire subject, so that the court may say that it was intended to be a substitute for the first." ' " (*Ibid.*)

The question of whether the 1934 amendment repealed the provisions of the 1918 initiative in whole or in part was first addressed in *Penziner,* which held that the amendment did not completely repeal the initiative. (*Penziner, supra,* 10 Cal.2d at pp. 176–177.) Instead, the amendment repealed by implication only those provisions of the 1918 initiative that were so irreconcilable with the amendment that the two could not have concurrent operation. (*Penziner,* at pp. 176–177; accord, *Nuckolls v. Bank of California* (1937) 10 Cal.2d 266, 276–277.) The court reasoned that the language of the amendment's final paragraph reflected an "intent that non-conflicting prior statutes shall remain in force." (*Penziner,* at p. 174.) Because *Penziner* involved a lender that was not exempted by the 1934 amendment, the court had no occasion to consider whether or to what extent the amendment impliedly repealed the 1918 initiative as to exempt lenders.

In assessing whether the compound interest limitation was impliedly repealed for exempt lenders, we consider whether the limitation is irreconcilable with the conferred authority under article XV to "fix, regulate or limit" an exempt lender's fees or "other compensation."

The terms "fees, bonuses, commissions, [and] discounts" in article XV do not appear to embrace the assessment of compound interest. But the catchall term "other compensation" does. Civil Code section 1915 defines interest as "the *compensation* allowed by law or fixed by the parties for the use,

or forbearance, or detention of money." (Italics added.) That section of the Civil Code existed long before the enactment of the 1934 amendment. Because voters are presumed to be aware of existing laws at the time a constitutional amendment is enacted (*In re Lance W.* (1985) 37 Cal.3d 873, 890, fn. 11), the voters who enacted the 1934 amendment presumably intended the term "compensation" to include interest as defined in the Civil Code.

Obviously, the more frequently interest is compounded, the greater a lender's compensation will be for the use of its money. This is so because a borrower is obligated to pay interest on both the principal amount borrowed and on any interest compounded and added to the principal. *Lewis v. Pacific States Sav. & Loan Co.* (1934) 1 Cal.2d 691, 695, explained that compounded interest is taken into account when determining whether a transaction violates the maximum annual interest allowed. *Heald v. Friis-Hansen* (1959) 52 Cal.2d 834, 840, confirmed that compounding the maximum allowable interest rate at intervals shorter than one year results in an effective annual rate that is usurious. These cases rest on the premise that compounded interest is part of the lender's compensation for the use of its money. Thus, the term "compensation" encompasses compound interest that effectively increases the lender's return.

Wishnev disputes this conclusion, arguing that the compounding of interest is a "method of calculating interest" and not a "charge" similar to the types of compensation listed in article XV. The federal district court in *Wishnev I* agreed, concluding that the terms "fees, bonuses, commissions, discounts or other compensation" in article XV "can reasonably be construed as reaching such things as loan fees and points, not

14

compound interest." (*Wishnev I*, *supra*, 162 F.Supp.3d at p. 945.) The court pointed out that the second paragraph of article XV prohibits a lender from receiving "more than the interest authorized by this section" as a result of "charging any fee, bonus, commission, discount or other compensation . . . ." Because article XV distinguishes interest from the enumerated types of compensation, the court reasoned, those types of compensation must be distinct from interest, compound or otherwise. (*Wishnev I*, at p. 945.)

The district court's attempted distinction misses the mark. The use of the term "interest" in the second paragraph of article XV simply refers to the maximum interest *rate* allowed by law. The 1934 amendment sought to prevent lenders from exceeding the rate cap by disguising interest as fees or other types of charges. As explained in the argument in favor of the amendment: "[The] inadequacy [of the 1918 initiative] is blatantly apparent. Its purpose has not been fulfilled. The loan shark still prospers and collects interests grossly in excess of the specified legal rate. Interest disguised as 'charges' is currently exacted at rates that range as high as *eighteen hundred per cent per annum*." (Ballot Pamp., *supra*, argument in favor of Assem. Const. Amend. No. 79, p. 18.) Properly construed, article XV treats "any fee, bonus, commission, discount or other compensation" as *part* of the interest received by a lender, not exclusive from it. Indeed, the long-standing general rule is "that the word 'interest' [is] broad enough to cover 'bonus', 'commission', or any other form of 'compensation' paid to the lender for the use of the money . . . ." (*In re Fuller* (1940) 15 Cal.2d 425, 434.)

The district court's attempt to characterize loan fees and points as "other compensation" while excluding compound interest is unpersuasive. (See *Wishnev I, supra,* 162 F.Supp.3d at p. 945.) Loan points are simply "additional interest" paid to the lender at the outset that is "added to the interest charged by the terms of the loan and amortized over the term of the loan to determine whether the total interest charged to the borrower exceeds the statutory maximum limits." (11 Miller & Starr, Cal. Real Estate (4th ed. 2018) § 37:27, p. 37-110, fn. omitted.) Just as with loan points, compound interest must be taken into account to assess whether a transaction is usurious. (See *Lewis v. Pacific States Sav. & Loan Co., supra,* 1 Cal.2d at p. 695.) Both kinds of charges increase the lender's compensation. There is no reason to treat the two differently under article XV.

Urging compound interest is excluded from "other compensation," Wishnev invokes a rule of statutory construction known as *ejusdem generis.* This doctrine provides that "when a general word or phrase follows a list of specifics, the general word or phrase will be interpreted to include only items of the same class as those listed."[14] (Black's Law Dict. (10th ed. 2014) p. 631, col. 1.) Wishnev argues that "other compensation" must be interpreted narrowly to mean only items similar to the specific terms that precede the general term.

_____

[14] As an example, in the phrase "sun, moon, planets, and other large bodies," the general term "other large bodies" would be interpreted to mean other large *heavenly* bodies to be consistent with the more specific terms that precede it. The general term would not be given the much broader connotation it might otherwise have: a meaning that might embrace bodies of water or certain professional athletes.

Maxims of statutory construction, including the doctrine of *ejusdem generis,* are not immutable rules but instead are guidelines subject to exceptions. (Cf. *In re Joseph B.* (1983) 34 Cal.3d 952, 957.) "In construing a statute a court's objective is to ascertain and effectuate the underlying legislative intent. [Citation.] This fundamental rule overrides the *ejusdem generis* doctrine, just as it would any maxim of jurisprudence, if application of the doctrine or maxim would frustrate the intent underlying the statute." (*Moore v. California State Bd. of Accountancy* (1992) 2 Cal.4th 999, 1012.) "[*E*]*jusdem generis* is only an aid in getting the meaning and does not warrant confining the operations of a statute within narrower limits than were intended." (Llewellyn, *Remarks on the Theory of Appellate Decision and the Rules or Canons About How Statutes Are To Be Construed* (1950) 3 Vand. L.Rev. 395, 405.)

Wishnev claims the express terms that precede the general term "other compensation" are types of loan charges and discounts. He characterizes compound interest as merely a method of calculating interest and not a charge or discount like those enumerated in article XV. The claimed distinction fails. On a more general level of abstraction, compound interest is indistinguishable from loan charges. Both give the lender greater compensation for the use of its money. Ultimately, the application of *ejusdem generis* here depends upon how broadly or narrowly one defines the similarities among the enumerated items. But any such effort must honor the ultimate goal of effectuating voter intent.

Wishnev's narrow reading fails to honor the enactors' intent in 1934. One stated purpose was to protect borrowers against "the oppressive burden of legally assessed charges" that

increase the lender's compensation beyond the maximum allowable interest rate. (Ballot Pamp., *supra*, argument in favor of Assem. Const. Amend. No. 79, p. 19.) Interpreting "other compensation" narrowly does not serve that purpose. Wishnev points to no ballot materials or other indicators of voter intent suggesting they sought to give the Legislature the power to regulate only certain types of compensation exempt lenders might extract from borrowers. His proposed application of the *ejusdem generis* doctrine would unduly confine the Legislature's authority to regulate lender compensation, a power the amendment was intended to confer.

Determining that article XV confers legislative authority to regulate compound interest *in some way* does not fully answer the question of whether the particular compound interest limitation was impliedly repealed as to exempt lenders. We conclude that it was.

As explained, the ability to charge compound interest increases the amount of compensation a lender receives. The compound interest limitation regulates this extra compensation in a precisely defined way by limiting the circumstances under which a lender can compel its payment. However, the 1934 amendment confers upon the Legislature the power to regulate an exempt lender's compensation "in any manner." This broad legislative authority necessarily conflicts with the more narrow compound interest limitation. For example, the Legislature could expressly allow an exempt lender to charge compound interest if that term is disclosed in an unsigned writing, rather than requiring signed consent to that particular term. But that approach to regulating lender compensation would be

inconsistent with a rigid and continued application of the compound interest limitation.

Wishnev argues that the compound interest limitation can be harmonized with the legislative authority granted under article XV. He describes the compound interest limitation as simply imposing a "procedural threshold of disclosure and consent before a particular loan agreement will be deemed to allow compounding of interest . . . ." In effect, he portrays the compound interest limitation as a regulation of the *agreement* in which certain loan charges may be imposed instead of a regulation of the *charges* themselves.

Wishnev mischaracterizes the limitation. Whether considered procedural or substantive, the limitation bans compounding of interest in the absence of written notice and signed agreement. In other words, the 1918 initiative prohibits charging compound interest unless the limitation is satisfied. A lender that fails to comply with the limitation is not authorized to impose the compounding of interest at all and faces significant penalties if it does so. The compound interest limitation necessarily restricts legislative authority to specify when compounding is permitted.

Because of the irreconcilable conflict between the focused compound interest limitation and the broad authority granted to the Legislature under the 1934 amendment, one might conclude that the amendment now found in article XV impliedly repealed the limitation as to exempt lenders. Alternatively, it could be argued that no actual irreconcilable conflict arises until the Legislature exercises its authority in a manner that creates a conflict. A corollary of this argument is that the compound

interest limitation remains the default rule for exempt lenders until irreconcilable legislation is enacted.  This argument fails.

Shortly after the 1934 amendment was enacted, the court considered a similar contention in construing other applications of the amendment unrelated to the compound interest limitation.  In *Matulich v. Marlo Investment Co.* (1936) 7 Cal.2d 374, 376 (*Matulich*), the borrower argued that "until the legislature has acted under the authority given by [the 1934 amendment], no conflict exists between the [1918 initiative] and the Constitution, and therefore the [1918 initiative] is still applicable."  The argument was rejected: "We are not able to see the force of this contention.  There is nothing in this section of the Constitution which would intimate that the general restrictions placed upon all lenders of money by the provisions of the [1918 initiative] were to remain in force until the legislature had acted under the power given in said section. . . . In order to accept appellant's construction of said section of the Constitution, it would be necessary for the court to read into the section a provision not to be found therein, and which it is quite evident the framers thereof never intended to include therein.  The court has no such authority."  (*Ibid.*)

*Matulich's* holding has been consistently applied.  *Wolf v. Pacific Southwest Etc. Corp.* (1937) 10 Cal.2d 183 addressed whether an exempt lender remained bound to comply with the 1918 initiative's interest rate cap until the Legislature exercised its authority over that class of lender under the 1934 amendment.  The court concluded that, if the Legislature had not exercised its authority over a particular exempt lender, there was no statutory or constitutional law limiting the amount of interest the  lender might receive.  (*Wolf v. Pacific Southwest*

*Etc. Corp.*, at p. 184.) Likewise, in *Carter*, *supra*, 33 Cal.2d at page 582, the court declared that "until the Legislature exercises the power granted to it by the amendment to regulate the business of lenders in a manner appropriate to each exempted class, the class not so governed by legislation is subject to no restriction on interest rates or charges." (Accord, *West Pico Furniture Co. v. Pacific Finance Loans* (1970) 2 Cal.3d 594, 614.)

The analysis applies equally to the compound interest limitation, which is one of the "general restrictions" upon lenders contained in the 1918 initiative. (*Matulich*, *supra*, 7 Cal.2d at p. 376.) Moreover, because voters are presumed to be aware of existing laws and their judicial construction (*In re Lance W.*, *supra*, 37 Cal.3d at p. 890, fn. 11), it must be presumed they were aware that, by amending the Constitution in 1979 to allow the Legislature to designate additional classes of exempt lenders, lenders so designated would be relieved of the restrictions contained in the 1918 initiative, including the compound interest limitation. The Legislature was likewise presumptively aware of this settled law in 1981, when it enacted Insurance Code section 1100.1 and designated insurers like Northwestern Mutual as exempt for the first time. (See *People v. Giordano* (2007) 42 Cal.4th 644, 659.)

This conclusion is consistent with the argument presented to voters, which declared that the 1918 initiative's attempt to uniformly regulate all lenders "failed miserably." (Ballot Pamp., *supra*, argument in favor of Assem. Const. Amend. No. 79, p. 19.) "[I]t was the purpose of the constitutional amendment of 1934 to free the Legislature from the restraints imposed by inflexible usury provisions so that interest and charges more

appropriate to business conditions peculiar to each of the exempted classes could be established." (*Carter, supra,* 33 Cal.2d at p. 582.) The compound interest limitation was one such inflexible restraint the 1918 initiative applied uniformly to all lenders.

This court has repeatedly expressed in broad terms that designating lenders as exempt under the 1934 amendment also "operates to exempt those classes from the restrictions in the [1918 initiative]." (*Heald v. Friis-Hansen, supra,* 52 Cal.2d at p. 838; accord, *Matulich, supra,* 7 Cal.2d at pp. 376–377; *Wolf v. Pacific Southwest Etc. Corp., supra,* 10 Cal.2d at p. 184; *Carter, supra,* 33 Cal.2d at pp. 582–583; *West Pico Furniture Co. v. Pacific Finance Loans, supra,* 2 Cal.3d at p. 614.) Wishnev correctly points out that the compound interest limitation was not at issue in any of the cited cases. It is, of course, "axiomatic that a decision does not stand for a proposition not considered by the court." (*People v. Barker* (2004) 34 Cal.4th 345, 354.) While the cited cases are not directly on point, their logical foundation assists in discerning electoral intent as to the compound interest limitation's continued application.

There is little reason to believe voters intended to declare exempt lenders free from *all* of the restrictions of the 1918 initiative *except* the compound interest limitation. Nevertheless, Wishnev claims that cases discussing the impact of the 1934 amendment support such an outcome. Like the court in *Wishnev I, supra,* 162 F.Supp.3d at page 945, he places particular reliance on the following passage in *Penziner*: "The amendment does, however, place in the hands of the legislature the power to control *certain of the charges* of certain designated classes of lenders." (*Penziner, supra,* 10 Cal.2d at p. 173, italics

added.) He also relies on the following sentence from the same decision: "All that the constitutional amendment does is to reduce the maximum permissible rate from 12 per cent to 10 per cent per annum; to exempt certain enumerated classes of lenders from certain of its provisions; and to place in the legislature a *certain* degree of control over the *fixing of charges* made by the exempted groups." (*Id.* at p. 177, italics added.) Taken together, these passages purportedly demonstrate that the 1934 amendment conferred upon the Legislature authority over only "certain" of the charges exempt lenders may exact, not all loan-related assessments.

As an initial matter, the admonition that "a decision does not stand for a proposition not considered by the court" applies equally to the authority relied upon by Wishnev. (*People v. Barker*, *supra*, 34 Cal.4th at p. 354.) *Penziner* did not consider the compound interest limitation or even involve an exempt lender. Moreover, it is unremarkable that *Penziner* would characterize the 1934 amendment as conferring authority on the Legislature to regulate "certain" rather than "all" charges imposed by exempt lenders. By its plain terms, the legislative authority to regulate exempt lenders under article XV does not extend to all charges that may be loan-related. Instead, that authority is limited to "fees, bonuses, commissions, discounts or other compensation" that a lender may charge in connection with a loan. (Art. XV.) Not all charges that may be imposed by a lender necessarily fall within the definition of "other compensation." It has long been held that " 'compensation' " paid to a lender for use of money is distinct from third-party charges or expense items that a borrower might pay to the lender, such as appraisal fees, recording fees, and insurance. (*In*

*re Fuller*, *supra*, 15 Cal.2d at p. 434.) Even under the 1918 initiative, the Legislature had the authority to regulate such third-party expenses because the initiative restricts legislative action only as to maximum interest rates and the compensation a lender receives for the use of its money. (Cf. *In re Fuller*, at p. 434.) A fee for a loan-related service, like an appraisal fee, does not compensate the lender for the use of its money. Instead, it is a cost paid to someone other than the lender, or reimbursement to the lender for a cost imposed by a third party.

As long as a charge falls within one of the specifically enumerated categories or can be considered "other compensation," the Legislature has power to regulate that charge in any manner. The reference in *Penziner* to the Legislature having authority to control "certain" charges imposed by exempt lenders does not necessarily suggest that compound interest falls outside of the scope of the Legislature's power.

Accordingly, we hold the 1934 amendment impliedly repealed the compound interest limitation as to exempt lenders. This conclusion does not mean exempt lenders may charge compound interest without a contractual or legal basis to do so.[15] It simply means they are not subject to statutory liability and penalties otherwise imposed by the 1918 initiative on nonexempt lenders.

---

[15] Wishnev concedes that the question of whether Northwestern Mutual had a contractual basis to charge compound interest here is distinct from the issue of whether Northwestern Mutual complied with the compound interest limitation.

C.    *Application of Compound Interest Limitation*

The Ninth Circuit asked whether the procedures employed by Northwestern Mutual satisfy the compound interest limitation.[16] (*Wishnev II*, *supra*, 880 F.3d at p. 495.) As the Ninth Circuit recognized, this question only arises if it is first determined that exempt lenders are subject to the limitation.[17] (*Id.* at p. 502.)  Because the answer to the first question fully resolves the matter pending before the Ninth Circuit, its second question is rendered moot.

---

[16] The second question posed by the Ninth Circuit reads as follows:  "Does an agreement meet the requirement of section 1916–2 if it is comprised of:  (1) an application for insurance signed by the borrower, and (2) a policy of insurance containing an agreement for compound interest is subsequently attached to the application, thus constituting the entire contract between the parties pursuant to section 10113 of the California Insurance Code?"

[17] The Ninth Circuit and the parties seem to have assumed that Northwestern Mutual was an exempt lender at all relevant times.  We express no view concerning whether a lender's designation as exempt under article XV applies retroactively to a loan that may predate the designation.

## III.  CONCLUSION

We answer the Ninth Circuit's first question as follows. The provision in section 1916–2 prohibiting lenders from assessing compound interest "unless an agreement to that effect is clearly expressed in writing and signed by the party to be charged therewith" does not apply to lenders exempt under article XV.

**CORRIGAN, J.**

**We Concur:**

**CANTIL-SAKAUYE, C. J.**
**CHIN, J.**
**LIU, J.**
**CUÉLLAR, J.**
**KRUGER, J.**
**GROBAN, J.**

*See next page for addresses and telephone numbers for counsel who argued in Supreme Court.*

**Name of Opinion** Wishnev v. The Northwestern Mutual Life Insurance Company

_____

**Unpublished Opinion**
**Original Appeal**
**Original Proceeding** XXX on request pursuant to rule 8.548, Cal. Rules of Court
**Review Granted**
**Rehearing Granted**

_____

**Opinion No.** S246541
**Date Filed:** November 14, 2019

_____

**Court:**
**County:**
**Judge:**

_____

**Counsel:**

Drinker Biddle & Reath, Stephen C. Baker, Timothy J. O'Driscoll, Michael J. Stortz, Alan J. Lazarus, Matthew J. Adler and Marshall L. Baker for Defendant and Appellant.

Alston & Bird, Reed Smith, Thomas A. Evans; and Lisa Tate for The American Council of Life Insurers as Amicus Curiae on behalf of Defendant and Appellant.

Sidley Austin, Carol Lynn Thompson and Lisa E. Schwartz for Metropolitan Life Insurance Company as Amicus Curiae on behalf of Defendant and Appellant.

Brad Wenger; Dentons US, Laura L. Geist and Andrew S. Azarmi for Association of California Life and Health Insurance Companies as Amicus Curiae on behalf of Defendant and Appellant.

Bramson, Plutzik, Mahler & Birkhaeuser, Robert M. Bramson and Jennifer S. Rosenberg for Plaintiff and Respondent.

**Counsel who argued in Supreme Court (not intended for publication with opinion):**

Timothy J. O'Driscoll
Drinker Biddle & Reath
One Logan Square, Suite 2000
Philadelphia, PA 19103
(215) 988-2700

Robert M. Bramson
Bramson, Plutzik, Mahler & Birkhaeuser
2125 Oak Grove Road, Suite 125
Walnut Creek, CA 94598
(925) 945-0200